UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>BRYAN COHEN and GEORGE NIKAS,<br><br>Defendants. | 19CV9645<br><br>Civil Action No. _____<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission ("the Commission"), for its Complaint against Defendants Bryan Cohen ("Cohen") and George Nikas ("Nikas"), alleges as follows:

### SUMMARY OF THE ACTION

1. Between in or about April 2015 and in or about November 2017, Defendants Cohen and Nikas actively participated in an international insider trading scheme that netted Nikas at least $2.6 million in illicit profits.

2. Throughout that period, Cohen, who was employed at a large international investment bank ("Investment Bank A") carried out the scheme by misappropriating from his employer material nonpublic information concerning impending corporate transactions. Cohen directly or indirectly tipped the information to at least one individual who used it to trade securities ("Trader A"). Trader A further tipped the corporate deal information to his friend Nikas, who also used it to illegally trade securities.

3. Based on the tips that Cohen provided, Trader A and Nikas realized millions of dollars in illicit gains from trading the securities of at least two different public companies—Syngenta AG and Buffalo Wild Wings, Inc.—in advance of news that these companies had been targeted for acquisition in contemplated or agreed upon corporate deals (the "Deals"). At all relevant times, securities of each company traded on United States securities exchanges.

4. Cohen expected to, and in fact did, receive cash in exchange for the insider tips he provided to Trader A.

5. In exchange for Trader A sharing Cohen's tips, Nikas provided Trader A with a share of the profits and/or other benefits.

6. By knowingly or recklessly engaging in the conduct described in this Complaint, Defendants violated, and unless restrained and enjoined will continue to violate, Sections 10(b) and 14(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b), 78n(e)] and Rules 10b-5 and 14e-3 thereunder [17 C.F.R. §§ 240.10b-5, 240.14e-3].

## NATURE OF PROCEEDING AND RELIEF SOUGHT

7. The Commission brings this action under Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)]. The Commission seeks permanent injunctions against the Defendants, to enjoin them from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint; disgorgement of profits realized from the unlawful insider trading set forth herein; and civil monetary penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1], and for such other relief as the Court may deem just and appropriate.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over this action under Sections 21(d), 21(e), 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and 78aa]. Certain of the acts, practices, transactions, and courses of business constituting the violations made use of a means

or instrumentality of interstate commerce, or of the mails, and/or of the facilities of national securities exchanges.

9. Venue in this District is proper under Section 27 of the Exchange Act [15 U.S.C. § 78aa], because certain of the acts, practices, transactions, and courses of business constituting the violations alleged in this Complaint occurred in the Southern District of New York.

## THE DEFENDANTS

10. **Cohen**, age 33, resides in New York, New York. Between 2010 and August 2017, Cohen worked in the London office of Investment Bank A, whose global headquarters are in New York City. In August 2017, Cohen transferred to the New York office of Investment Bank A, where he is currently employed. Investment Bank A provides financial advisory and other services to publicly traded companies in connection with strategic transactions, including business combinations such as mergers, acquisitions and tender offers.

11. **Nikas**, age 54, is a Greek citizen who has a residence in New York, New York and owns a restaurant chain, "GRK Fresh," with restaurants in Manhattan. Nikas also has a residence in Athens, Greece.

## FACTUAL ALLEGATIONS

### A. Cohen's Access to Material Nonpublic Information and Duties to Maintain Confidentiality

12. In or about 2010, Cohen began working at Investment Bank A in London, England. Cohen worked on deal teams advising bank clients on confidential corporate transactions, including transactions involving publicly traded U.S. companies.

13. As an employee of Investment Bank A, Cohen had access to material nonpublic information about impending business transactions involving companies advised by Investment Bank A through his direct involvement working on these transactions, through his access to Investment Bank A's files, and/or through contact with co-workers staffed on the transactions.

14. Cohen and all other personnel of Investment Bank A were subject to an internal compliance policy entitled, "Policies Regarding the Safeguarding of Confidential Information,

the Chinese Wall and Other Information Barriers" ("Investment Bank A Confidential Information Policy"), which during the relevant period explicitly stated that:

> We regularly receive confidential information as part of our normal client relationships. To breach a confidence or to use confidential information improperly or carelessly would be unthinkable.

15. The Investment Bank A Confidential Information Policy prohibited employees from trading on the basis of material nonpublic information obtained in the course of their work or tipping others to trade on the basis of such information.

**B.   Overview of the Insider Trading Scheme**

16. Nikas and Trader A have known each other since at least early 2011, often communicating with each other via email and/or cell phone. Trader A and Nikas were friends and beginning in at least 2013, Trader A provided securities trading tips to Nikas in exchange for a share of the profits. On at least two occasions, Nikas provided profitable trading tips to Trader A. On more than one occasion, Trader A traveled to New York City and stayed overnight at Nikas' apartment.

17. Cohen and Trader A have known each other since at least July 2014.

18. By at least in or about April of 2015, Cohen began participating in a fraudulent insider trading scheme with Trader A.

19. In furtherance of this unlawful scheme, Cohen obtained material nonpublic information from Investment Bank A relating to potential or planned corporate events that could be used to profitably trade securities and tipped this information to Trader A. On multiple occasions, Trader A further tipped this information to Nikas.

20. From the outset of the scheme, Cohen expected to receive cash payments for the material nonpublic information that he provided.

21.     During the course of the scheme, Cohen in fact received substantial cash payments from Trader A in exchange for the inside information he provided to Trader A.

22.     Based on the material nonpublic information that Cohen provided, Trader A and Nikas generated huge profits purchasing the securities of companies that had been targeted for acquisition in advance of such information being disclosed to the public.

23.     Trader A and Nikas established "long" positions in companies that were targeted for acquisition by purchasing shares of common stock, American Depositary Shares, and/or contracts-for-difference.

24.     An American Depositary Share ("ADS") is a U.S.-dollar denominated equity share of a foreign-based company available for purchase on a U.S.-based stock exchange. ADSs are issued by U.S.-based depository banks under agreement with the foreign-based company.

25.     A contract-for-difference ("CFD") is an agreement between two parties to exchange the difference in value of an underlying stock or ADS between the time the contract is opened and the time at which it is closed. If the share price of the underlying stock or ADS increases, the seller pays the difference to the buyer; however, if the share price declines, the buyer must pay the seller. A CFD thus mirrors the movement and pricing of its underlying stock or ADS on a dollar-for-dollar basis, such that any fluctuation in the market price of the underlying security is reflected in the unrealized gain or loss of the CFD position. The purchase and sale prices of CFDs are identical to the prices quoted for the shares on the public exchange on which the underlying common stock or ADS is listed.

26.     An equity CFD purchaser typically initiates a long position in the same manner in which he or she would purchase common stock, by submitting an order with a CFD provider to buy a certain number of CFDs in a particular stock. The provider ordinarily purchases the

corresponding number of the underlying shares to hedge its position and writes the CFDs to the client at the same price.

27.     As set forth below, through foreign brokerage firms, Nikas purchased CFDs that were based on underlying securities traded on United States exchanges. These foreign brokerage firms hedged their exposure by purchasing the underlying securities through domestic brokerage firms, or purchasing CFDs through other foreign brokerage firms, which in turn purchased the underlying U.S.-listed securities through domestic brokerage firms.

### C.     Cohen Tips Material Non-Public Information about Syngenta, a Company Advised by Investment Bank A.

28.     In or about April 2015, Cohen directly or indirectly tipped Trader A about the potential corporate acquisition of Syngenta AG ("Syngenta"), a biotechnology company based in Basel, Switzerland, whose shares traded on the Swiss exchange, under the ticker symbol SYNN, with a share price quoted in Swiss francs ("CHF"). At all relevant times, Syngenta ADSs were traded on the New York Stock Exchange under the ticker symbol SYT and the company had U.S. reporting obligations under the Exchange Act.

29.     As of April 2015, Investment Bank A had a longstanding advisory relationship with Syngenta, which included an anti-raid mandate (meaning that Syngenta had retained Investment Bank A to help the company defend against hostile takeover attempts).

30.     On April 17, 2015, representatives of Syngenta informed Investment Bank A that The Monsanto Company ("Monsanto") had made an unsolicited proposal to acquire Syngenta. Cohen, who was working as a Vice President in the London office of Investment Bank A, was made aware of Monsanto's proposal that very same day.

31. Shortly after learning about the Monsanto proposal, in late April 2015, Cohen informed Trader A about the unsolicited offer; Trader A then passed that information along to Nikas.

32. On April 30, 2015, after the markets closed, news media reported that Monsanto had approached Syngenta about potentially acquiring the company. These reports were not confirmed by the companies and did not include information about the acquisition offer price.

33. On May 1, 2015, Nikas purchased 11,000 Syngenta ADSs for a total of $854,340 through a brokerage account in his name located in the United States (the "Nikas Schwab Account").

34. That same day, Nikas also purchased 9,000 Syngenta CFDs (based on Syngenta ADSs) for a total of $698,407 through an account held in his name with a brokerage firm in Denmark ("Nikas Denmark Account 1").

35. On May 7, 2015, Nikas bought an additional 16,000 Syngenta ADSs in the Nikas Schwab Account for a total of $1,156,765.

36. Also on May 7, 2015, Nikas purchased an additional 17,000 Syngenta CFDs (based on Syngenta ADSs) for a total of $1,233,539, through the Nikas Denmark Account 1. This same day, he also purchased an additional 13,000 CFDs (based on Syngenta ADSs) in a separate account, over which he had power of attorney, held in the name of his mother at the same foreign brokerage firm ("Nikas Denmark Account 2").

37. On May 7, 2015, after the markets closed, the news media reported that Monsanto had made an initial offer to acquire Syngenta for approximately CHF 450 per share, representing a 35% premium to Syngenta stock's last closing price.

38. On May 8, 2015, Syngenta publicly acknowledged having received and rejected an acquisition proposal from Monsanto, at a price of CHF 449 per common share. That day, the

7

price of Syngenta shares trading on the Swiss exchange and Syngenta ADSs trading on the New York Stock Exchange rose. The May 8, 2015 closing price for Syngenta shares was CHF 396.90, an increase of CHF 64.20 (19.3%) over the previous day's closing price. The ADS price at the close on May 8, 2015 was $85.75, an increase of $8.75 (11.36%) over the previous day's closing price.

39. Between May 8, 2015 and May 12, 2015, in the wake of Monsanto's offer to acquire Syngenta being disclosed to the public, Nikas sold the Syngenta CFDs and ADSs he had acquired for total profits of approximately $787,246.

40. Shortly after Syngenta announced that it rejected Monsanto's offer, China National Chemical Corp. ("ChemChina") approached Syngenta to discuss a possible transaction between the companies. Negotiations proceeded over the summer of 2015, with Syngenta rebuffing various overtures and proposals from ChemChina.

41. On August 26, 2015, Monsanto issued a press release stating that it was no longer pursuing its proposal for a business combination with Syngenta.

42. On September 18, 2015, representatives of Syngenta and ChemChina met to discuss ChemChina's proposed acquisition terms and Syngenta agreed to have its financial advisors meet with ChemChina's financial advisors to further evaluate the proposed terms.

43. On October 19, 2015 and October 20, 2015, the Syngenta board of directors held a regularly scheduled meeting, which was attended by representatives of Investment Bank A. At the meeting, the Syngenta board, the Company's senior management and the Company's advisors further reviewed and discussed the terms of ChemChina's August 10, 2015 acquisition proposals and ultimately decided to continue to explore discussions with ChemChina.

44. By early or mid-October 2015, if not earlier, Cohen shared material nonpublic information with Trader A about ChemChina's potential acquisition of Syngenta, which Trader A further tipped to Nikas.

45. Between October 15, 2015 and November 12, 2015, Trader A used this information to purchase 110,000 Syngenta CFDs (based on Swiss exchange-traded shares) through an account held in Trader A's name with a brokerage firm in Singapore ("Trader A Singapore Account").

46. On November 10 and November 11, 2015, Nikas purchased 28,000 Syngenta ADSs for a total of $1,939,946 in the Nikas Schwab Account.

47. On November 11 and 12, 2015, an account in the name of an investment vehicle that Nikas was involved in creating and funding ("Nikas Investment Fund Account") purchased a total of 55,000 Syngenta CFDs (based on Swiss exchange-traded shares) for a total of CHF 19,053,434. The Nikas Investment Fund Account was held with the same brokerage firm in Singapore used by Trader A. The Syngenta CFDs purchased on November 11, 2015 were the first trades in the account.

48. On November 12, 2015, after the markets closed, the news media reported that ChemChina was in talks to buy Syngenta.

49. On November 13, 2015, the closing price of Syngenta shares trading on the Swiss exchange was CHF 364.20, an increase of CHF 18.30 (5.29%) over the previous day's closing price, and the closing price for Syngenta's ADSs was $74.78, an increase of $5.63 (8.14%) over the previous day's closing price.

50. Between November 13 and 18, 2015, Trader A sold the 110,000 Syngenta CFDs purchased in the Trader A Singapore Account for a total profit of approximately CHF 4,493,464.

51. Between November 13 and 18, 2015, the Nikas Investment Fund Account sold all of its Syngenta CFDs generating a profit of approximately CHF 1,524,232.

52. Between November 13 and 18, 2015, Nikas sold the 28,000 Syngenta ADSs he had purchased in the days prior to the November 12 reports of ChemChina's attempt to acquire Syngenta for a total profit of approximately $127,738.

53. Discussions between ChemChina and Syngenta concerning the potential acquisition of Syngenta continued through the remainder of 2015 and into early 2016. During that time period, both Trader A and Nikas continued to buy Syngenta securities based on material nonpublic information that Trader A received from Cohen.

54. Between December 16, 2015 and February 2, 2016, the Nikas Investment Fund Account purchased 80,000 Syngenta CFDs (based on Swiss exchange-traded shares) for a total of CHF 29,971,275.

55. Between December 24, 2015 and February 2, 2016, Trader A purchased 110,000 Syngenta CFDs (based on Swiss exchange-traded shares) through the Trader A Singapore Account.

56. Between January 22, 2016 and February 2, 2016, Nikas acquired 25,000 Syngenta ADSs in the Nikas Schwab Account, for a total of $1,870,946.

57. On February 2, 2016, the news media began reporting that a deal between ChemChina and Syngenta was imminent. The next day, on February 3, before the United States markets opened, Syngenta announced that ChemChina had offered to acquire Syngenta on terms equivalent to a price of CHF 480 per share.

58. That week, Syngenta shares trading on the Swiss exchange closed on February 1 at CHF 378.40, on February 2 at CHF 392.30 (a 3.67% increase), and on February 3 at CHF

403.00 (a 2.73% increase); similarly, Syngenta ADSs closed on February 1 at $73.98, on February 2 at $78.57 (a 6.20% increase), and on February 3 at $80.23 (a 2.11% increase).

59.     On February 3, 2016, Trader A sold all 110,000 Syngenta CFDs in Singapore Account 1 for a total profit of approximately CHF 3,504,814.

60.     On February 3, 2016, the Nikas Investment Fund Account likewise sold all 80,000 of its Syngenta CFDs for a total profit of approximately CHF 2,804,320.

61.     Over the following days and weeks, Nikas sold his 25,000 Syngenta ADSs in the Nikas Schwab Account, netting an approximate profit of $134,446.

62.     In total, from the above described trading around media reports of a possible acquisition of Syngenta and the subsequent Syngenta/ChemChina merger announcement, Nikas realized profits of approximately $1,049,430 (through the Nikas Schwab Account, Nikas Denmark Account 1, and Nikas Denmark Account 2), and the Nikas Investment Fund Account generated additional profits of approximately CHF 4,328,552.

63.     Both the Monsanto and ChemChina bids for Syngenta contemplated an acquisition through means of a tender offer. At the time Cohen tipped Trader A, and Trader A further tipped Nikas, regarding these tender offers, a substantial step or steps to commence each of the offers—including (depending on the specifics of the tender offer) negotiations, board meetings, the arrangement of financing, the hiring of advisors, and/or proposals—had been taken.

**D.    Cohen Tips Material Non-Public Information about Buffalo Wild Wings, Inc., a Company Advised by Investment Bank A.**

64.     Shortly after Cohen moved from London to New York in August 2017, Cohen had phone contact with Nikas and/or one or more associates of Nikas, including on September 11 and 12, 2017. In or about the following month, Cohen provided material nonpublic information

11

to Trader A regarding a potential acquisition of Buffalo Wild Wings, Inc. ("Buffalo Wild Wings") and Trader A in turn provided this information to Nikas.

65. Buffalo Wild Wings is an American casual dining restaurant and sports bar franchise headquartered in Minneapolis, Minnesota. Buffalo Wild Wings' stock trades on the NASDAQ exchange under the ticker symbol BWLD.

66. On October 17, 2017, a representative of Buffalo Wild Wings contacted Investment Bank A to explore the possibility of Investment Bank A serving as financial advisor in connection with a review of strategic alternatives, including the interest of Arby's Restaurant Group Inc. ("Arby's") in acquiring Buffalo Wild Wings. Cohen was made aware of the potential acquisition of Buffalo Wild Wings that same day, October 17, 2017.

67. On or about October 17, 2017, Cohen tipped Trader A about the potential merger of Arby's and Buffalo Wild Wings, and Trader A further tipped this same information to Nikas.

68. Between October 20, 2017 and October 27, 2017, Nikas purchased 22,000 shares of Buffalo Wild Wings in the Nikas Schwab Account, for a total of $2,544,154. Of this amount, he sold 9,000 shares between October 30, 2017 and November 1, 2017, for a total profit of approximately $79,074.

69. On November 13, 2017, after the markets closed, the news media reported a rumor that Buffalo Wild Wings had received a takeover bid. As a result, Buffalo Wild Wings share price increased from $117.25 price at the close on November 13, 2017 to $145.35 at the close on November 14, 2017, an increase of almost 24%.

70. On November 14, 2017, Nikas sold his remaining shares of Buffalo Wild Wings for a total profit of approximately $343,298.

71. After the media report, Investment Bank A was contacted by three other potential acquirors expressing interest in acquiring Buffalo Wild Wings.

72. On November 16 and 17, 2017, the board of directors of Buffalo Wild Wings held their regularly scheduled meetings and discussed the Arby's offer.

73. From November 17 through 20, 2017, representatives of Investment Bank A, at the direction of the Buffalo Wild Wings board of directors, contacted seven potential strategic and financial acquirors, including the three which had initiated contact with Investment Bank A following the November 13 media reports. Each of the parties contacted by Investment Bank A declined to submit an indication of interest.

74. Beginning on November 19, 2017, Buffalo Wild Wings granted Arby's and its representatives access to certain additional due diligence information requested by Arby's.

75. On November 20, 2017, Nikas resumed buying shares of Buffalo Wild Wings in the Nikas Schwab Account, purchasing a total of 69,000 shares by November 27, 2017, for a total of $9,769,038.

76. On November 21, 2017, the Nikas Investment Fund Account purchased 20,000 Buffalo Wild Wings CFDs for a total of $2,851,494.

77. Late on November 28, 2017, Arby's and Buffalo Wild Wings announced that they had entered into a definitive merger agreement under which Arby's would acquire Buffalo Wild Wings for $157 per share in cash in a transaction valued at approximately $2.9 billion. Buffalo Wild Wings closing stock price on November 27, 2017 was $146.40 per share and it jumped to $155.60 at the close on November 28, 2017, an increase of approximately 6.28%.

78. On November 28, 2017, the Nikas Investment Fund Account sold its 20,000 Buffalo Wild Wings CFDs for a total profit of approximately $265,592.

79. Between November 28 and 30, 2017, Nikas sold all 69,000 of his recently purchased shares of Buffalo Wild Wings in the Nikas Schwab Account for a total profit of approximately $971,175.

80. In total, between the November 13, 2017 media reports of a possible acquisition of Buffalo Wild Wings and the November 27, 2017 Buffalo Wild Wings/Arby's merger announcement, Nikas and the Nikas Investment Fund Account realized profits of approximately $1,580,065.

## FIRST CLAIM FOR RELIEF

*Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder*

81. The Commission re-alleges and incorporates by reference Paragraphs 1 through 80 above as if they were fully set forth herein.

82. Cohen provided, or caused to be provided, material nonpublic information about each of the Deals to one or more tippees, including Trader A and Nikas, knowing or having a reasonable expectation or recklessly disregarding that the tippee(s) would trade and/or tip others to trade on the basis of that information. In each such instance, a reasonable investor would have viewed the information as being important to his or her investment decision.

83. Cohen had a duty to maintain the confidentiality of the material nonpublic information he obtained about the Deals by virtue of his employment with Investment Bank A. Cohen breached that duty by providing such material nonpublic information to others for use in connection with securities trading and in exchange for personal benefits or with the expectation of receiving a benefit.

84. Nikas traded in securities of Syngenta and Buffalo Wild Wings while in possession, and on the basis, of material nonpublic information about the Deals provided by Trader A. In each such instance, Nikas knew or recklessly disregarded that the information provided was material and nonpublic. Nikas also knew, recklessly disregarded, should have known, or consciously avoided knowing that such material nonpublic information had been

conveyed to and/or obtained by Trader A in breach of a duty or obligation arising from a similar relationship of trust or confidence.

85. By engaging in the conduct described above, Cohen and Nikas, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, with scienter:

    (a) employed devices, schemes, or artifices to defraud;

    (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

    (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

86. By reason of the actions alleged herein, Cohen and Nikas violated and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**SECOND CLAIM FOR RELIEF**

*Violations of Section 14(e) of the Exchange Act and Rule 14e-3 Thereunder*

87. The Commission re-alleges and incorporates by reference Paragraphs 1 through 80 above as if they were fully set forth herein.

88. By engaging in the conduct described above, Cohen, prior to the public announcement of tender offers to acquire Syngenta, and after a substantial step or steps to commence each of the tender offers had been taken, while in possession of material information relating to each of the tender offers, which information he knew or had reason to know was nonpublic and had been acquired directly or indirectly from the offering company, the issuer, or any officer, director, partner, or employee, or other person acting on behalf of the offering company or issuer, communicated material nonpublic information relating to each of the tender

15

offers under circumstances in which it was reasonably foreseeable that the communication was likely to result in the purchase and sale of the securities sought or to be sought by such tender offers.

89. In addition, Nikas, prior to the public announcement of tender offers, and after a substantial step or steps to commence each of the tender offers had been taken, while in possession of material information relating to the tender offers, which information he knew or had reason to know was nonpublic and had been acquired directly or indirectly from the offering company, the issuer, or any officer, director, partner, or employee, or other person acting on behalf of the offering company or issuer, purchased or caused to be purchased or sold or caused to be sold the securities sought or to be sought by such tender offers.

90. By reason of the actions alleged herein, Cohen and Nikas violated and, unless restrained and enjoined, will continue to violate Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 thereunder [17 C.F.R. § 240.14e-3].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a judgment:

I.

Finding that Defendants Cohen and Nikas each violated Sections 10(b) and 14(e) of the Exchange Act [15 U.S.C. §§ 78j(b), 78n(e)] and Rules 10b-5 and 14e-3 thereunder [17 C.F.R. §§ 240.10b-5, 240.14e-3];

II.

Permanently restraining and enjoining Defendants from violating Sections 10(b) and 14(e) of the Exchange Act [15 U.S.C. §§ 78j(b), 78(n)(e)] and Rules 10b-5 and 14e-3 thereunder [17 C.F.R. §§ 240.10b-5, 240.14e-3];

III.

Ordering each Defendant to disgorge, with prejudgment interest, all ill-gotten gains or unjust enrichment derived from the actions alleged herein;

IV.

Ordering Defendants to pay civil monetary penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1];

V.

Retaining jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

VI.

Granting such other and further relief as this Court may determine to be just and appropriate.

Dated: October 18, 2019

By: *[signature: Assunta Vivolo]*

Joseph G. Sansone
Assunta Vivolo
Caitlyn Campbell
Michael D. Foster*
Rua M. Kelly*
U.S. Securities and Exchange Commission
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(215) 597-1047 (Vivolo)
vivoloa@sec.gov

*Not admitted in the S.D.N.Y.